On behalf of the Appellant, Mr. Arnold Stein. On behalf of the Appellee, Ms. Karen Levine. Before we begin, I do want to indicate that Justice Bowman was unable to be here today. But he will certainly review the tape of the arguments and has presented us with some questions that he would like us to ask. So with that, Mr. Stein. Good morning, writers. As in our appellant's brief, we presented the issue which we believe is an issue of first impression in the state of Illinois. Dealing with does the language of Section 503E of the Illinois Marriage and Dissolution of Marriage Act, which vests in each spouse a species of common ownership at the time the divorce action is filed, mean that property acquired during the marriage but transferred by one of the parties before the filing of the dissolution of marriage into an annuity held in an offshore irrevocable trust is no longer part of the marital estate, even though the spouse is the sole annuitant scheduled to get the property back at a certain date. The trial court in this case ruled that marital property does not exist until the filing of a petition of dissolution of marriage, so that actions that Mr. Riedmeier took to divest the marital estate of property 10 years before the action was filed were not to be considered by the court as marital property. Even if this was non-marital property, why wouldn't the court consider it in dividing the marital estate? If this property was non-marital property, as Mr. Biber first represented to the court in his initial answers to interrogatories, the court would have to consider it. Section 503 is very clear in case law. Interpreting 503 is supportive of the proposition that in the division of marital property, the value of non-marital property must be considered or the amount of non-marital property awarded to each party must be considered. In this case, that never occurred. And it didn't occur because of the various either procedural rulings that this court ruled upon in the forms of denying Mary Bither's specific actions for declaratory judgment relative to the annuities and certainly a finding by the court made on February 3rd, 2009 that Reed Bither did not have an interest in the annuities. We believe, as laid out in our brief, that those rulings were incorrect. And that was made pursuant to the motions in Lemonade? That last ruling you were referring to, or was it the declaratory judgment? The ruling of February 3rd, 2009 was a ruling where the trial judge denied, dismissed with prejudice, our actions for declaratory judgment, filed and ruled that Reed Bither had no interest in the annuities. I thought one of the main reasons for the ruling was that this was a disguised third-party complaint. Well, that was one of the bases upon his ruling. And, again, we believe that the trial court was wrong. There is a distinct difference between a declaratory action brought under Section 701 of the IMDMA and an action for joinder, whether that action for joinder is brought under 405 or 406. The dismissal of the declaratory judgment action, which stated a cause of action with prejudice, was reversible error in this case. Did the declaratory judgment petition seek to have the funds moved from Bermuda to Lake County for some disposition? We filed a motion first to join the protector, Jeffrey Taylor. I know. I'm asking about the declaratory judgment. Yes, there was a petition asking for Lee to amend our petition for dissolution of marriage, which had a declaratory judgment counted and, in fact, was count two of the pleading, which also asked that the property be moved from Bermuda to Lake County. Okay, but what I'm getting at is that, again, another basis that the court used was that you didn't have jurisdiction over the trustee and you didn't seek to join the trustee. And my question is, the declaratory judgment petition, the stand-alone declaratory judgment petition, in that you didn't seek the funds to be moved or did you? In the stand-alone declaratory judgments, which were filed subsequent, we did not ask for a joinder of the trustee, we did not ask for a joinder of the protector, and we did not ask for the funds to be relocated. Obviously, that was the gravamen of what we were ultimately asking the court to do because we're asking the court to determine that those assets were, in fact, marital property. Why the long delay in raising the issue of the offshore trusts? I don't believe that there was a long delay. We served discovery almost immediately within 30 days or shortly within 30 days of the filing of the dissolution action. Several months after we served our initial request for interrogatory answers, Mr. Biber took the position that these annuities and the offshore trusts were non-marital property. It wasn't until almost 11 months later, in June, mid-June of 2008, 2009, excuse me, that he changed his position and argued that they were not non-marital property, but they were no longer part of the marital estate. Shortly thereafter, we took a series of actions to contest that. We served a subpoena for deposition on Jeffrey Taylor, the protector. Within 75 days, we filed a petition asking for the joinder of the protector, and in less than 100 days, we asked for leave to file an amended petition for dissolution of marriage, seeking a declaratory judgment and, of course, the transfer of these funds. I don't believe that that was dilatory. In fact, I believe it was very responsive and acting quickly to a change in the theory of a case filed by our opponents when they sat on that theory for basically 11 months. Now, why do we believe that these annuities are marital property? Because that's the real gravamen of the issue. And that requires an understanding of the relationship of, an understanding of the provisions of Section 503 of the IMDMA. Under Section 503A of the IMDMA, all property acquired during the marriage, irrespective of how title to that property is held, is deemed to be marital property. Our opponents, as well as the court, took umbrage to that and took the position that, based upon Section 503E of the IMDMA, there is no marital property, it cannot be marital property until the action for dissolution of marriage is filed. Are you taking a procedural jump, though? I mean, the trial court struck the petitions, right? I mean, we're talking about the petition for, let's say, on these premier trusts. The trial court struck that petition, correct? Correct. And the trial court never really ruled that it was marital or non-marital. Now, the trial court did rule it was an expectancy, therefore it was not his property at all. But, I mean, other than that ruling regarding expectancy, you know, shouldn't we really be looking at whether the striking of the petition was proper? And then, if it was improper, sending it back for a hearing on that for the court to determine whether it was marital or non-marital? Yes. And as we stated in our brief, we believe that the striking of the declaratory judgment actions were improper. Right. But I'm just saying, you're arguing now that this is all marital, and I don't even know if we— do we get to that point procedurally here? Certainly, we have argued that the dismissal of our declaratory judgment actions was improper as a matter of law, subject to de novo review, and should be reversed. And if that is the case, ultimately, I believe Your Honor is correct, that in a remand and a retrial of the case, we will get to the ultimate issue of whether the actual annuities were marital property. And we believe that the dismissal with prejudice, when we stated we believe a cause of action, we demonstrated as a declaratory judgment action mandates that our client had a tangible interest in the property, the property being the funds that were sitting in the annuities that were purchased during the marriage with marital funds. Let's get to that, actually. Initial input from his father, $2,500, something like that. Then there was a $41,000 deposit. Who made that deposit? The record is totally unclear as to where that money came from. Then there was a $2.2 million loan that was paid back, but then somehow those funds then went to start the second annuity. That's correct. Were those funds ever paid back? Paid back to Mr. Byler? Yeah, to the husband, to the great woman. Those funds ostensibly are still sitting in the annuity. That's the problem. It's clear that the birth of proof to establish that the annuities were either non-marital or not part of the estate fell on Mr. Byler. He never demonstrated where the $41,500 came from to purchase the first annuity. We know where the second annuity came from, and it came from money that was ostensibly loaned from Crane. Crane Plumbing was an asset acquired during the marriage, therefore it was marital. The money that came out of Crane that went into Cascade, the first annuity, therefore has to be deemed marital. Under 503C of our Act, when you commingle marital with non-marital funds, the asset that is created is marital property. The $2.2 million that went into the September Trust, again emanating and originating from Crane, is marital property. I know from the prior question you asked me, am I jumping the gun? Perhaps I am, but the fact of the matter is justice needs to be done in this case. There is no question that the money that is sitting in Bermuda in the form of these annuities is marital property. And we believe, not only do we believe that the denial of the declaratory judgments was wrong, we believe that upon a remand we will demonstrate that the assets that are sitting in the annuities are marital property. Let's shift gears a little bit and get to the other declaratory judgment petition. Did you properly allege a fiduciary relationship, breach of that relationship, and or fraud? You're talking about the Wisconsin properties? Wisconsin, Davis, Dempster. Let me address each. The Wisconsin property deals with a residence... I want to know specifically whether your declaratory judgment petition properly alleged fiduciary relationship, breach of that relationship, and or fraud. I believe that we allege that there is a confidential relationship that existed between Mr. and Mrs. Beiler. Mr. Beiler, during the course of the entire marriage, took it upon himself, based upon his sophistication in finances, to handle the financial relationships between the parties. And Mrs. Beiler, consequently, placed her trust and reliance on those. And as we argued in our brief, that established a confidential relationship in which he owed her a duty of telling the truth and being honest. As to the issue of joining the trustee, the trustee of the Cupert, the Qualified Personal Residence Trust, was Mr. Beiler. He was already a party before the court. He was also the only beneficiary of the Cupert. There was no one else to join. Our motion was correct. We stated a tangible interest. They stated an opposite view. There was an actual controversy. And by denying the declaratory judgment, the court committed a reversible error. And as a result of that, then granted the motions in limine, which prohibited the introduction of any evidence at the trial of these issues. And that's the point. The point is we never had an actual trial on the merits of this case. And what about her? I think the trial court did make a finding in some fashion that your client was represented by an attorney. Is it related to the gift of the Dempster property? Well, as to the Dempster property, the court made a finding that our client was represented by counsel based upon the testimony of Jeffrey Taylor. But if you examine Jeffrey Taylor's testimony very carefully, it's specious at best. He testified that he believed that our client was represented by a Mary Harris because he believed the font on the assignment document must have come from her word processor. There is no reference anywhere on the assignment document that the document was prepared by a Mary Harris. There wasn't a single piece of paper introduced in the trial that indicated that there were any negotiations or correspondence that took place between Jeffrey Taylor and Mary Harris. Based upon that de minimis amount of testimony refuted by Mary, Mary Byler and her author of proof that she never knew what she understood what she signed. It was presented to her by her husband. She was not represented by Mary Harris and was never told the consequences of that document. That's the totality of the evidence that existed on Dempster Street. And as a result of that, the court concluded based upon the word give in an assignment that also had consideration contained within it. The forgiveness of an indemnification against liability that it was a gift. Well, the fact of the matter is, if I ask you for a pen, I ask you to give me your pen and you give it to me. Does that mean you made a gift to me? I don't think it does. The word give was part of boilerplate language that also talked about transfers and assignments of this interest. And the court made a ruling that it was a gift, which we believe was against the manifest weight of the of the evidence and an abuse of discretion, but also by denying the declaratory judgment made it an error of the law. The result is, again, through the motion in limiting that Mr. Byler wound up with a very valuable, very valuable asset, just like he did the Wisconsin property and just like he did with the annuities. Did the court make a finding that the Wisconsin property was gifted? I don't know that there was an actual finding that there was a gift of the of the. In fact, if you look at the opinion of the court, the Wisconsin property is not even mentioned in the in the ultimate judgment of dissolution of marriage that was entered. The judgment of dissolution of marriage that was entered is silent as it relates to Davis Street. It's silent as it relates to the annuities, and it is silent as to the Wisconsin property. Well, you could see that as the court saying this is not part of the marital estate. I think that's what the court was saying. And I believe that in so ruling the court was wrong in each in each instance. Mr. Byler, as it related to the Cupert, was not only the settler. He was a trustee and he was the beneficiary. I understand that. But didn't she sign a deed over to him for him to put it in? There was no evidence. A deed was never introduced. The implication or the inference was that a deed was signed. Again, we argue that in our declaratory judgment action that these actions were colorable and illusory and fraudulent as against her marital rights. Council, thank you. Your time is up. You will have time for rebuttal. Thank you. Appreciate it. Is it Miss Levine or Levine? Thank you. You may proceed. Throughout the briefing, Mary's council has admitted that the Bermuda Trusts are expectancy interests. Throughout the briefing, Mary's council admits that the Bermuda Trusts give read only in expectancy interest, which can't be apportioned by the court. Don't we apportion expectancies in divorce cases? Never. So this is different than a pension? Very different from a pension because a pension is something that has to do with work. And personal efforts is a marital asset. But none of this has to do with work. Where did this money come from to start these things? Well, the money came, the first one came from Mr. Bidler's father, John Bidler. And the second one came from Crane Plumbing. There was a loan from Crane Plumbing. And it was never paid back? It was not paid back, no. So how did that come from work? And how did that come from something within the marital estate that they both worked to build up? Well, I can say two things about that. First, we don't know what portion from what in Crane Plumbing it came from. For all we know, it wasn't anything directly related to Mr. Bidler's work. But secondly, he did own Crane Plumbing. And it was acquired during the marriage? It was acquired during the marriage. So if we were dividing up Crane Plumbing, we'd say Crane Plumbing was a marital asset? We did divide up Crane Plumbing. I'm just saying though, so if I take $2.2 million out of Crane Plumbing during the marriage and put it somewhere, how is that not part of the marriage? It's not part of the marital estate for two reasons. First of all, Kuczywinski makes very, very clear, and that's a 1978 case, that the term marital property doesn't even come into being until there is something filed, a dissolution of marriage filed. And it's not even triggered until the time of the dissolution. So there's no such thing as marital property at that point. And the Supreme Court in Johnson v. LaGrange State Bank, which is also a 1978 case, discusses what it means to transfer something during the marriage. So taking $2.2 million, putting it into an annuity that exists today, you're saying that that is not by definition marital property? That's correct, because the $2.2 million, which started the annuity, is owned by a third party, a trust. A trust is not the same as Mr. Biver. But it was owned by your client when it was transferred? It was owned by my client in 1996, 11 years before the filing of the dissolution of marriage came about. After he had hired a divorce attorney. Well, wait a minute. Let's talk about that. There were two meetings. Answer my question. He made all these steps after he conferred with a divorce attorney. Is that correct? He made the steps after seeing one divorce attorney in 1996 for which he paid $495 and one sometime in 1997 for which he paid another $400 and some odd dollars. So is that answer correct? Yes, but he never filed for a dissolution of marriage at that point. And Johnson v. LaGrange Bank makes clear that you can transfer property even if the sole reason you're transferring it is to deprive a spouse of what you would be calling marital property, as long as the transfer is real. And that's what you really have to look for, whether the transfer is real. And throughout this, there's been statements that Reid is going to be getting this annuity on January 1, 2010. And that's just not true, because the face of the annuity, and I have it if you want to see it, makes clear, right above where it says January 1, 2010, it says, or the date may vary. And then you can go through the entire portion of this annuity contract. But he's the sole annuitant, correct? But he can be changed. No, no, no, I understand. I'm not arguing with you. I'm asking you a question. Yes. Is he or is he not the sole annuitant? Presently. Well, wait, I don't know now. Okay, well, I mean, we're going to solve it when all this comes about. And so I take it he also took $2.2 million and started an annuity at that time where his wife was the sole annuitant. No, he didn't. Okay. And how is this a real transfer? Could this trustee actually take the money and give it to whoever they wanted to right now without anything? So I could take $2.2 million, put it in this annuity that's held in trust, and the trustee then has sole ownership, or the trustee could take that $2.2 million or any assets that were derived from that, you know, and just give it to anybody that I don't even know. Well, assuming that he's not breaching his fiduciary duty to the various people in the specified class, which he does have, and there are statements in the trust document talking about that, that there's a responsibility. So what's important here is that Reed's interest in that annuity is no different than somebody's interest in a will because that annuitant can be changed by the trustee. The start date can be changed by the trustee. And not only that, trustee can draw out money so Reed might not get anything. But the point of fact is that the trustee can change the annuitant. How is that any different than the heir to a living will? And there are cases like in re-marriage of Eddie where there was a trust and the daughter had an interest in the trust, but the interest was something that was at the sole discretion of the trustee plus the wife's father. And there, in that situation, the trial court valued that interest. And on appeal, the court says, you can't value that. There is no guarantee that she will get anything. And the same is true here. Nor would we have in every divorce case have every parent go and give a will, and we would then look and see whether or not one of the parties was a beneficiary under that will. The difference between your client's position and a will is that if you're the beneficiary in a will, generally speaking, you really don't control who the beneficiary is. Your client controls who the beneficiary is. No, he doesn't. There's nothing. Is he still the beneficiary or the annuitant? The annuitant has nothing to do. There are two separate things between the beneficiaries and the annuitant. The annuitant is measuring life as to when the payments would start paying out. The annuitant can change. It can go on until Mr. Beidler is 89, if he's still the annuitant, or whoever the annuitant is. It can go on until they're 89. The beneficiaries of both of those trusts are Mr. Beidler, his children, their descendants, and the American Cancer Society. And both of those trusts were written to stay a long time. One of them, the Cascade Trust, is supposed to last 100 years, and the September Trust is supposed to last until 21 years after the heirs of King George III are dead. So these are long trusts. These are not something that's just devised as some sort of a way for Mr. Beidler to take money out. And there's nothing in the record that shows any sort of control. And as a matter of fact, he doesn't have any control over any of this. And it is just like a will, because he doesn't have any control over who the annuitant could be. Couldn't the court have fashioned something where there would be yearly reports, where he would report how much he received from this annuity and then remit a portion of that or a percentage of that to Mrs. Beidler? Well, certainly the court can control him, and he can control—he may not get anything, as you say. But if he got something, you know, the corpus of this presumably being marital property when it was put in, again, I understand the argument that it's not marital until we file for divorce. But do we—so we look at the title and the ownership at the time of divorce, is what you're saying. That's right. So I could really right now take property and give it to whoever I wanted to without my spouse knowing anything about it, and then that's just gone, even though I may get some of it back in the future. Hold on a second, but that's exactly what Johnson v. LaGrange Bank said was appropriate. And I want to just read from that case, if I can, for a second, because I think it's an important thing. And it says that a property owner has an absolute right to gift away owned property during his or her lifetime, even if the transfer is for the precise purpose of defeating the other spouse's marital rights in the property. And that's the way it goes unless it's illusory or colorable. So let's just talk about what that means. An illusory instrument is an instrument where there really was never any donative intent, and that's what you look at. Johnson case does not—rejects looking at control. It's just looking at donative intent. And what it looks at is to whether or not you intended to give the property away. And so here, the only one we would be looking at is the September Trust. It's our position that Mr. Bidler's father created the Cascade Trust. Mr. Bidler took that $2.2 million, and he gave it away to that trust. And then that trust has various beneficiaries and bought an annuity. Your time is limited, so we're sliding into this area that I talk to counsel about, whether it's marital or non-marital funds. But again, getting back to the issue of striking the petition. Correct. You know, I don't know that the court made any findings on whether this transfer was illusory or colorable or ever got to whether it was marital or non-marital. The court basically struck the petitions without any type of hearing or any type of argument like you're making to me. That's not true. The court struck the petitions because one of the reasons was an expectancy, but one of the reasons was a disguised third-party complaint, not joining the trustees, you know, those issues. Those issues were part of it. First of all, I want to tell you that there were five arguments on it, not even including the motion in limine. And they were long arguments. So there were hearings on that. Secondly, the court made two findings. One, that the annuities were expectancies. And he did it because of the reasons that I'm suggesting to you right now. Because of Johnson v. Grange Bank, because of the fact that there was no ‑‑ it was an expectancy interest, so it was like in re the marriage of Sentioli and in re the marriage of Eddy and even in re the marriage of Peschette, which in, like, years ago, talked about whether or not you should have a third-party complaint. And the first issue you look at as to whether or not this issue is something that should come in before the court is whether or not it's marital property or an expectancy. And if it's an expectancy, you'd never have a third-party complaint. So that was the case law that the court was going on when it made those findings. As far as the other thing, these people waited until after all the witnesses were disclosed and in some cases ‑‑ and all the expert witnesses were disclosed and at the 11th hour started bringing these claims. Not once, but five times. But if it was a third-party complaint, as the judge ruled, it was untimely based upon the case management order. Correct. But if it was a declaratory judgment petition or motion, and again, I argue whether it's a petition, the difference between those two. But let's say you can look at it as a declaratory judgment motion. It was filed timely, correct? I don't believe it was. And I'm going to tell you why. 113008? There should have been an amendment, which they knew, which is why they did it, to the original divorce petition. To come in at the last minute and file a totally new claim making statements about fraud regarding real estate transfers on December 1st, which is when they filed it, without leave of court. When discovery was closing in February and the trial, which was originally scheduled for January 4th but was pushed to March, I think, 4th, I mean, that would have been totally prejudicial to us. So the court still had discretion to do what it wanted to do in terms of that case management order. And what it found was, was that counsel wasn't diligent. And that was an accurate finding. Can you shift gears to the real estate petition? Yes. And let me ask you, I know I asked counsel about the court making a finding that Mrs. Bieler was represented by counsel in the one transaction, correct? She was. Now, that's the Bieler Family Limited Partnership transfer, which everything came in on that one. Right, which would be a gift of the Dempster property. Correct. She was represented by Mary Harris. And then there was also a gift of the Wisconsin property right at that same time frame, correct? Well, the BFLP transfer was a little bit later, but yes. Okay. Why did Mrs. Bieler need an attorney on the one and not the other? Well, I'm not sure that she didn't have counsel on the other one. It's just not in the record on the transfer from the Cooper. It's just not in the record. There's nothing in the record about it, but it's my understanding that she did. If, in fact, your client told his then wife that this transfer of the Dempster property was for estate planning purposes, as alleged in the petition for the purpose of transferring this property more efficiently to the children upon their demise, why would she need an attorney of her own? Well, first of all, we're mixing them up. The Bieler Family Limited Partnership was transferred not because of estate planning reasons. In that case, Mrs. Bieler transferred the asset because it was risky and it was a problematic property that had gone in and out of foreclosure, and that's why she transferred. There were two discussions about that, and Mr. Bieler talked about getting her an attorney, and Jeff Taylor said that he had a discussion with Mary Harris just about the fact of representing Mrs. Bieler and getting these documents drafted. And so one, although both were gifts, the Bieler Family Limited Partnership was done to get a risky asset out of both the Children's Trust and Mary's Trust, and in the Children's Trust, the reason that was basically a sale was because Mr. Bieler had to make up a negative capital account for that because there was a negative capital account in the Bieler Family Limited Partnership, and he didn't want the Children's Trust to have to pay it. And with Mary Bieler, it was because the property was in trouble, and there were discussions about it, and she agreed to transfer it. So those are two separate things. As far as the Cupert's concerned, it's absolutely true that it is an estate planning vehicle. There's no lie about that. That's what it is. And the fact that Mr. Bieler still has use of that property, and they say for a life, that's not true. It's a term of years. And at the time of trial, 13 years were up. Mrs. Bieler could have valued that interest. There was nothing precluding her from doing it. And as a matter of fact, at the motion of limine, Mr. Stein asked whether he was barred from doing that, and the judge said absolutely not, and then they brought nothing in on that. Is it kind of an interesting estate planning vehicle to have, while they're married, have only one party be able to use it for a term of years? Actually, that's not the case. And I know it's not in the record, but the way these usually work is there is usually one party that is the party that receives the interest for a term of years. It's not usually two. That's just the way they're usually done. In a marriage situation? In a marriage situation, yes. That's interesting. Any other questions? All right. Thank you, Counselor. Thank you. Mrs. Stein, you may have your butt line. Don't get that close. It's okay. Let me first address the issue of the annuity and the rights of Mr. Byler as the sole annuitant. As your honors will know from reading our brief, on page 7 of the basic annuity contract, it provides that the annuity application is part and parcel of the contract that was entered into. This is, in fact, a blown-up version of the annuity application. And what's instructive is what it shows. It shows first that the annuitant is Reid Byler. It shows the amount of money of the initial premium funding the annuity at $2,252,316. It also demonstrates that the annuity starting date or payment date is January 1, 2010. It's labeled Annuity Commencement Date. It is signed by Reid Byler as the annuitant. It is also signed by the contract owner, a representative of Harrington Trust Limited. What does that mean? It means that under the terms of this annuity, Mr. Byler was the sole annuitant entitled to receive the money on the annuity commencement date of January 1, 2010. For opposing counsel to argue that this annuity commencement date is without meaning is absolutely a misrepresentation to the court. Further evidence of the significance of Mr. Byler being the sole annuitant as well as his right to the commencement date is also contained at the bottom third of this document, where it defines the beneficiary, again, the trust, for any proceeds payable upon the annuitant's death before the date of the first annuity payment or for any annuity payment falling due after the annuitant's death. That language is unequivocal. And you offer this in response to the Jadsen vs. Jadsen argument? Yes, absolutely, Your Honor. It is unequivocal. It is signed by Reed Byler stating that the information contained on this application is true and correct. Those are not mere words. It is clear that Mr. Byler was the sole annuitant. He was solely entitled to the money as of January 1, 2010. Whether he got the money on January 1, 2010 is not the appropriate question. The question is, did he maintain at the time of the filing of this divorce a marital property interest in a piece of property or an asset that was acquired during the marriage with marital funds? If the answer to that question is yes, then this annuity is marital property and subject to equitable division by the court. And that is exactly what did not occur in this case. There never was an equitable division of marital property. Do we have to actually answer the question yes, or do we simply need to find if we so choose that this was colorable or potentially colorable? I don't know that you have to get to the answer to the ultimate question. Obviously, I'm trying to convince you of that fact, that that is the ultimate answer to the question. But if, in fact, that you find that this was a colorable and illusory transfer designed to take away marital rights of our client while being retained by Reed Byler, then I believe you have to reverse the trial court's decision and remand the case for a new trial. As it relates, finally, to the issues of the Cupert and Dempster Street and these annuities, I just want to comment that there's an element of common sense that has to be invoked in every case. And if you look at it in this case, what you find is that in each instance where there was a valuable marital piece of property, in each instance around the time that Reed Byler went to see a divorce attorney, there were transfers made that took away rights of Mary Byler and marital property. That's the Cupert, that's the Dempster Street property, and it's the annuities. And that is unjust, improper, and deserves a remand. Thank you very much. No, ma'am. That's it. That's the burden and his rebuttal. And we have all the briefs in the record. Certainly we're reviewing all that. We will issue a decision in due course.